# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| CITIZENS FOR RESPONSIBILITY ) | |
| AND ETHICS IN WASHINGTON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| ) | Civ. Action No. 08-1468 (EGS) |
| v. ) | |
| ) | |
| U.S. DEPARTMENT OF JUSTICE, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## MEMORANDUM OPINION

Plaintiff Citizens for Responsibility and Ethics in Washington ("CREW") brings this action under the Freedom of Information Act ("FOIA"), seeking records that were created by the Federal Bureau of Investigation ("FBI") in conjunction with Special Counsel Patrick Fitzgerald's ("Fitzgerald" or the "Special Counsel") interview of former Vice President Richard Cheney. Defendant, the Department of Justice ("DOJ" or the "agency"), identified sixty-seven pages of records documenting the interview, which was conducted as part of the Special Counsel's investigation into who exposed Valerie Plame Wilson as a covert operative for the Central Intelligence Agency ("CIA"). The agency withheld the records of the interview in their entirety on the basis that disclosure of the documents could reasonably be expected to interfere with law enforcement proceedings. *See* 5 U.S.C. § 552(b)(7)(A). In addition, DOJ identified limited categories of information within the documents that, according to the agency, were exempt from disclosure under other FOIA exemptions.

Now pending before the Court are the parties' cross-motions for summary judgment. Upon careful consideration of the motions, responses and replies thereto, the supplemental briefing submitted by the parties, oral argument during the motions hearings held on June 18, 2009 and July 21, 2009, the applicable law, and the entire record, the Court concludes that the agency has failed to meet its burden of demonstrating that the requested documents were properly withheld in their entirety under any FOIA exemption protecting law enforcement interests. Limited portions of those documents, however, were properly withheld under exemptions designed to protect information that is privileged or that could impinge on personal privacy or threaten national security. Accordingly, and for the reasons stated herein, the Court **GRANTS IN PART AND DENIES IN PART** both parties' motions and directs the government to produce the records with appropriate redactions to withhold the information that falls within the properly invoked exemptions identified in this Memorandum Opinion.

## I.  Background

### A.  Factual Background

Plame's identity as a covert operative for the CIA was publicly revealed shortly after her husband, Ambassador Joseph Wilson, wrote a *New York Times* editorial in which he argued that the Bush administration had manipulated intelligence to support President Bush's statement in the 2003 State of the Union address that Iraq had purchased uranium from Niger.  *See* Robert D. Novak, Column, *Mission to Niger*, Wash. Post, July 14, 2003, at A21; Joseph C. Wilson IV, Opinion, *What I Didn't Find in Africa*, N.Y. Times, July 6, 2003, § 4, at 9.  An investigation into the leak of Plame's identity was commenced by the FBI, which eventually led to the appointment of Fitzgerald as Special Counsel.  As part of this investigation, a number of senior White House officials, including but not limited to President Bush, Vice President Cheney, and

2

Vice President Cheney's Chief of Staff, I. Lewis Libby, were interviewed by the FBI.  Compl. ¶ 19; Answer ¶ 19.  Libby was subsequently indicted and, after a jury trial, convicted on charges of perjury, obstruction of justice, and making false statements, all of which arose from his conduct during the investigation.  *See* Tr. of Mot. Hr'g at 9 (June 18, 2009) ("First Mot. Hr'g Tr.").  Following the conviction, Libby was sentenced to 30 months of imprisonment.  The sentence was subsequently commuted by President Bush on July 2, 2007.  *See* Order, *United States v. Libby*, No. 05-394 (D.D.C. July 3, 2007) (citing Grant of Executive Clemency).  No other criminal cases were brought as a result of the Special Counsel's investigation.

The House of Representatives Committee on Oversight and Government Reform (the "Committee") conducted an independent investigation into the leak of Plame's CIA identity, during which it sought to obtain relevant documents from DOJ.  Compl. ¶ 22.  As part of the Committee's investigation, DOJ made available redacted reports of FBI interviews with White House personnel for Committee staff to review.  Answer ¶ 22.  DOJ, however, refused to provide the reports of the interviews with either President Bush or Vice President Cheney to the Committee.  Pl.'s Statement of Material Facts Not in Dispute ¶ 4.  In June 2008, the Committee issued a subpoena seeking the production of documents, "for which the former Special Counsel has not determined that disclosure would be barred by Federal Rule of Criminal Procedure 6(e) governing grand jury secrecy," relating to interviews with the President, Vice President, and other senior White House officials.  *See* Subpoena, attached as Ex. A to Decl. of Steven G. Bradbury ("Def.'s Ex. A").  Specifically, the Committee demanded unredacted versions of "transcripts, reports, notes, and other documents relating to any interviews outside the presence

of the grand jury" of the President and the Vice President.[1]  Def.'s Ex. A.  The Committee also

sought "[u]nredacted versions of FBI 302 interview reports" from interviews with Libby, Karl

Rove, Condoleezza Rice, Scott McClellan, and Cathie Martin.  Def.'s Ex. A.

After DOJ's Office of Legal Counsel ("OLC") assembled and reviewed the documents

responsive to the Committee's subpoena, Attorney General Michael Mukasey wrote a letter to

President Bush "request[ing] that [the President] assert executive privilege with respect to" the

documents subpoenaed by the Committee.  Letter from Michael B. Mukasey, Attorney Gen., to

President George W. Bush at 1 (July 15, 2008), attached as Ex. B to Decl. of Steven G. Bradbury

("Def.'s Ex. B"); *see* Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem.") at 2.  According to the

Attorney General,

> [m]any of the subpoenaed materials reflect frank and candid deliberations among
> senior presidential advisers, . . . [and] concern a number of sensitive issues,
> including the preparation of [the President's] January 2003 State of the Union
> Address, possible responses to public assertions challenging the accuracy of a
> statement in the address, and the decision to send Ms. Plame's husband,
> Ambassador Joseph Wilson, to Niger in 2002 to investigate Iraqi efforts to
> acquire yellowcake uranium.  Some of the subpoenaed documents also contain
> information about communications between [the President] and senior White
> House officials.

Def.'s Ex. B at 1.

In a letter dated July 16, 2008, DOJ notified the Committee that President Bush had

granted the Attorney General's request and asserted executive privilege with respect to the

subpoenaed documents.  *See* Letter from Keith B. Nelson, Principal Deputy Assistant Attorney

Gen., to the Honorable Henry A. Waxman, Chairman, Comm. on Oversight & Gov't Reform at

---

[1]  The portion of the subpoena seeking records of interviews with President Bush was subsequently withdrawn.  *See*
Decl. of Steven G. Bradbury ¶ 3; Letter from Michael B. Mukasey, Attorney Gen., to President George W. Bush at 1
n.1 (July 15, 2008), attached as Ex. B to Decl. of Steven G. Bradbury ("Def.'s Ex. B").

1 (July 16, 2008), attached as Ex. C to Decl. of Steven G. Bradbury ("Def.'s Ex. C").  Relying on

the legal analysis set forth in the Attorney General's letter to the President, DOJ took the

position that the documents revealed "communications that lie at the absolute core of executive

privilege."  Def.'s Ex. C at 1.  Moreover, DOJ asserted that the Committee's demand for the

documents

> raises a serious additional separation of powers concern relating to the integrity
> and effectiveness of future law enforcement investigations by the Department.
> Were future Presidents, Vice Presidents and senior White House staff to perceive
> that providing voluntary interviews in the course of Justice Department
> investigations would create records that would likely be made available to
> Congress (and then possibly disclosed publicly outside of judicial proceedings
> such as a trial), there would be an unacceptable risk that such knowledge could
> adversely impact their willingness to cooperate fully and candidly in voluntary
> interviews.  They might insist, alternatively, on disclosing information only
> pursuant to grand jury subpoenas in order to ensure the secrecy protections of
> Rule 6(e) of the Federal Rules of Criminal Procedure.  Such a result would
> significantly impair the Department's ability to conduct future law enforcement
> investigations where such investigations would benefit from full and voluntary
> White House cooperation.

Def.'s Ex. C at 1-2.  On July 17, 2008, the Committee announced that the President had invoked

executive privilege in response to the subpoena.  Compl. ¶ 24.

### B.   Procedural Background

On the same day the Committee announced that President Bush had asserted executive

privilege to withhold the subpoenaed documents, CREW sent a FOIA request to DOJ requesting

records "relating to any interview outside the presence of the grand jury of Vice President

Richard B. Cheney that are part of Special Counsel Patrick Fitzgerald's investigation into the

leak of the identity of Valerie Plame Wilson, a covert CIA officer."  Compl. ¶ 25.  CREW

explained that its request was coextensive with the Committee's subpoena, and sought both a

waiver of fees and expedited processing of its FOIA request "in view of the particular urgency to

5

inform the public about the role Vice President Cheney played in the leak of Ms. Wilson's covert identity and the basis for the decision not to prosecute [him]." Compl. ¶¶ 25, 27.  By letter dated July 24, 2008, the Chief of Staff of DOJ's Office of Information and Privacy ("OIP") acknowledged receipt of the FOIA request and informed CREW that its expedited request had been granted by the Director of Public Affairs.  Compl. ¶ 29.

On August 25, 2008, CREW filed a complaint alleging that DOJ had failed to either produce, withhold, "or otherwise account[] for any responsive documents."  Compl. ¶ 32. CREW further claimed that DOJ had failed to expedite the processing of its request, exceeded the "generally applicable twenty-day deadline for the processing of *any* FOIA request," and "wrongfully withheld" the requested documents from CREW.  Compl. ¶¶ 33, 35.  As a result, CREW sought declaratory and injunctive relief "with respect to the expedited release and disclosure of the requested records."  Compl. ¶ 40.  On August 28, 2008, CREW filed a motion for a preliminary injunction, seeking an order requiring DOJ to "process and disclose the requested records immediately."  Mem. P. & A. Supp. Pl.'s Mot. Prelim. Inj. at 2.  Shortly thereafter, however, the parties agreed to a stipulation for the processing of CREW's request. *See* Stipulation and Order (Sept. 8, 2008).

On September 18, 2008, DOJ responded to CREW's request by submitting the declaration of Steven Bradbury ("Bradbury declaration"), the then Principal Deputy Assistant Attorney General for OLC.[2]  That submission included a number of attachments, one of which is a *Vaughn* index (collectively "original *Vaughn* submission").  *See* Ex. F to Decl. of Steven G.

---

[2]  At that time, Bradbury was the head of OLC and supervised its operations, including the office's response to FOIA requests.  Decl. of Steven G. Bradbury ¶ 1.  According to Bradbury, OIP conducted an initial search in response to CREW's request, but determined that the documents were held by the OLC, which handles its own FOIA requests. Def.'s Mem. at 2.  On September 4, 2008, OIP referred CREW's request to OLC, which located three records responsive to CREW's request.  Def.'s Mem. at 2.

Bradbury ("Def.'s Ex. F").  According to the original *Vaughn* submission, the records responsive

to CREW's request consist of (1) an FBI 302 report summarizing Fitzgerald's interview with

Vice President Cheney, and (2) two sets of contemporaneous notes taken by FBI agents during

the course of the interview.  *See* Decl. of Steven G. Bradbury ¶ 7; Def.'s Ex. F.  Collectively, the

requested records total sixty-seven pages.  Def.'s Mem. at 3.

DOJ withheld all responsive records on the basis that they were exempt from disclosure

under various FOIA exemptions.  Specifically, OLC concluded that the records were properly

withheld in their entirety under Exemption 7(A) and Exemption 5 because of their potential to

interfere with law enforcement proceedings.  In addition, OLC found that portions of the

documents could be withheld under Exemptions 1, 3, 5, 6, and 7(C).  DOJ filed an answer to the

complaint on September 26, 2008, and a motion for summary judgment on October 10, 2008.

CREW's cross-motion for summary judgment was filed on October 30, 2008.  Following a

hearing on the motions held on June 18, 2009, the Court ordered DOJ to (1) produce the records

for *in camera* inspection, and (2) file supplemental declarations "from appropriate declarants

explaining with specificity the precise information contained in the records that is exempt from

disclosure under FOIA, which exemptions apply to which portions of the records, and why such

exemptions apply."  Minute Order (June 20, 2009).  The Court also directed the parties to submit

supplemental briefing addressing "(1) any known instances in which high level White House

officials have engaged in interviews with law enforcement officials outside the context of a

grand jury subpoena, and (2) what, if anything, such officials have done to protect against the

content of those interviews from becoming public."  *Id.*

As part of its supplemental filing, DOJ submitted declarations from (1) Lanny A. Breuer,

the Assistant Attorney General of the Criminal Division of DOJ ("Breuer declaration"); (2)

David J. Barron, the Acting Assistant Attorney General for OLC ("Barron declaration"); and (3)

Ralph S. DiMaio, the Information Review Officer for the National Clandestine Service of the

CIA ("DiMaio declaration").  The Barron declaration, in conjunction with DOJ's supplemental

memorandum, claims the applicability of an additional exemption (Exemption 2) because of

administrative information "such as FBI file numbers" contained in the documents.  *See* Decl. of

David J. Barron ¶ 12; Def.'s Supplemental Mem. Supp. Mot. Summ. J. ("Def.'s Supplemental

Mem.") at 5 n.3.  In addition, DOJ asserts that the outline the Special Counsel created in

preparation for his interview of Vice President Cheney and reproduced as part of the withheld

documents is exempt from disclosure under Exemption 5 because of the work-product privilege.

*See* Decl. of David J. Barron ¶ 9; Def.'s Supplemental Mem. at 5 n.3.[3]

The Court held another hearing on the motions on July 21, 2009, and the motions are

now ripe for decision.

## II.     Legal Framework

### A.     Rule 56

Pursuant to Federal Rule of Civil Procedure 56, summary judgment should be granted if

the moving party has shown that there are no genuine issues of material fact and that the moving

party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*,

477 U.S. 317, 325 (1986); *Waterhouse v. District of Columbia*, 298 F.3d 989, 991 (D.C. Cir.

---

[3] CREW addresses these new claims in a footnote to its supplemental brief, and it is not entirely clear to what extent – if at all – the withholding under these exemptions is in fact contested.  CREW's lack of precision is entirely understandable in such a case, where the information asymmetry necessarily operates to the detriment of the party seeking disclosure.  *See King v. U.S. Dep't of Justice*, 830 F.2d 210, 218 (D.C. Cir. 1987) (noting that the purpose of agency affidavits is to correct "the asymmetrical distribution of knowledge that characterizes FOIA litigation").  Nevertheless, based on the Barron declaration and after careful *in camera* review, the Court concludes that these exemptions have been properly invoked.  Therefore, this Memorandum Opinion will not address these claims any further.

2002).  In determining whether a genuine issue of material fact exists, the court must view all

facts in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Likewise, in ruling on cross-motions for

summary judgment, the court shall grant summary judgment only if one of the moving parties is

entitled to judgment as a matter of law upon material facts that are not genuinely disputed.  *See*

*Rhoads v. McFerran*, 517 F.2d 66, 67 (2d Cir. 1975).

      **B.**     **FOIA**

      "'Public access to government documents' is the 'fundamental principle' that animates

FOIA."  *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 925 (D.C. Cir. 2003)

(quoting *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 151 (1989)); *see Coastal States*

*Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 868 (D.C. Cir. 1980) ("[T]he strong policy of the

FOIA [is] that the public is entitled to know what its government is doing and why.").  As a

result, FOIA requires that agencies of the federal government release requested records to the

public unless the documents fall within one or more of nine specific statutory exemptions.  5

U.S.C. § 552.  "Given the FOIA's broad disclosure policy, the United States Supreme Court has

'consistently stated that FOIA exemptions are to be narrowly construed.'"  *Wolf v. CIA*, 473 F.3d

370, 374 (D.C. Cir. 2007) (quoting *U.S. Dep't of Justice v. Julian*, 486 U.S. 1, 8 (1988)).

      The Court has jurisdiction to enjoin an agency from withholding records and order the

production of records that it concludes were improperly withheld.  § 552(a)(4)(B).  "In such a

case the court shall determine the matter de novo, and may examine the contents of such agency

records in camera to determine whether" an exemption applies to "such records or any part

thereof."  *Id.*  The burden lies with the agency to justify nondisclosure of responsive records.  *Id.*

This burden provides the only protection to the requesting party, who "faces an 'asymmetrical

distribution of knowledge' where the agency alone possesses, reviews, discloses, and withholds the subject matter of the request." *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 146 (D.C. Cir. 2006) (quoting *King v. U.S. Dep't of Justice*, 830 F.2d 210, 218 (D.C. Cir. 1987)).

The government may satisfy its burden of establishing its right to withhold information from the public by submitting appropriate declarations and, where necessary, an index of the information withheld. *See Vaughn v. Rosen*, 484 F.2d 820, 827-28 (D.C. Cir. 1973). To be entitled to summary judgment, the government's submission "must adequately describe each withheld document or deletion from a released document, and must state the exemption claimed for each deletion or withheld document, and explain why the exemption is relevant." *Summers v. Dep't of Justice*, 140 F.3d 1077, 1080 (D.C. Cir. 1998) (internal quotation marks omitted); *see also Nat'l Inst. of Military Justice v. U.S. Dep't of Defense*, 404 F. Supp. 2d 325, 331 (D.D.C. 2005) ("[A] court may rely on affidavits provided by an agency in granting summary judgment 'if the affidavits describe the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" (quoting *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981))).

## III.   Discussion

### A.   Exemption 7(A)

DOJ's principal legal argument is that the records requested by CREW were properly withheld in their entirety under Exemption 7(A). Exemption 7(A) permits an agency to withhold records from disclosure if the records were "compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could

reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A).
CREW concedes the threshold issue under Exemption 7(A) – that the requested documents were
compiled for law enforcement purposes. *See* Mem. P. & A. Opp'n to Def.'s Mot. Summ. J. &
Supp. Pl.'s Cross-Mot. Summ. J. ("Pl.'s Mem./Opp'n") at 8. Accordingly, the question in this
case is whether production of the documents "could reasonably be expected to interfere with
enforcement proceedings." DOJ contends that it has made such a showing, because (1) there are
likely to be future law enforcement investigations requiring the participation of senior White
House officials, and (2) disclosure of Vice President Cheney's interview could have a chilling
effect and deter such officials from voluntarily cooperating in those investigations. *See, e.g.*,
Def.'s Mem. at 8-9; Decl. of Steven G. Bradbury ¶ 9; First Mot. Hr'g Tr. at 11, 17, 19. CREW
strenuously disagrees, arguing that DOJ has failed as a matter of law to demonstrate that
Exemption 7(A) applies to shield disclosure of the requested records because (1) there are no
ongoing or reasonably anticipated law enforcement proceedings, and (2) DOJ's argument that
disclosure might chill White House officials is speculative and unsupported by historical fact.
*See, e.g.*, Pl.'s Mem./Opp'n at 9-10; Tr. of Mot. Hr'g at 55-57 (July 21, 2009) ("Second Mot.
Hr'g Tr.").

As a preliminary matter, DOJ notes that Congress "relaxed" the language of Exemption
7(A) in 1986, replacing the phrase that permitted withholding of information that "*would*
interfere with enforcement proceedings" with the broader "*could reasonably be expected to
interfere with enforcement proceedings.*" Def.'s Mem. at 7. According to DOJ, courts have
"repeatedly recognized that this change in the statutory language substantially broadens the
scope" of Exemption 7(A). Def.'s Mem. at 7 (citing cases). CREW does not dispute this
assertion, but contends that DOJ's withholding in this case does not meet that "relaxed"

standard.  Pl.'s Mem./Opp'n at 8.  Nevertheless, the parties agree that the applicable standard is

one of "reasonableness, which takes into account the lack of certainty in attempting to predict

harm while providing an objective test."  *Spannaus v. U.S. Dep't of Justice*, 813 F.2d 1285, 1288

(4th Cir. 1987) (internal quotation marks omitted).

        To determine whether DOJ has met its burden of showing that Exemption 7(A) applies,

this Court must consider whether disclosure of the requested records "(1) could reasonably be

expected to interfere with (2) enforcement proceedings that are (3) pending or *reasonably*

*anticipated*."  *Mapother v. Dep't of Justice*, 3 F.3d 1533, 1540 (D.C. Cir. 1993) (emphasis in

original); *see also Kay v. FCC*, 976 F. Supp. 23, 37 (D.D.C. 1997) ("The applicability of

Exemption 7(A) involves a two-step analysis: (1) whether a law enforcement proceeding is

pending or prospective; and (2) whether release of information about it could reasonably be

expected to cause some articulable harm.").  These issues will be addressed in turn.

### 1.    Pending or Reasonably Anticipated Enforcement Proceedings

        DOJ concedes that there is neither a pending enforcement proceeding with which the

disclosure of the records could interfere, nor an ongoing investigation that is likely to lead to

such proceedings.  *See* First Mot. Hr'g Tr. at 9, 54-55; Second Mot. Hr'g Tr. at 4.  The agency

nevertheless argues that investigations necessitating the cooperation of senior White House

officials are likely to be instituted in the future, and the realistic probability that such officials

may be called upon to participate in such an investigation is sufficient to fall under the definition

of a "reasonably anticipated" enforcement proceeding articulated by the D.C. Circuit in

*Mapother*, 3 F.3d 1533.  *See* Def.'s Mem. at 8-9; Def.'s Reply Mem. Supp. Mot. Summ. J. &

Opp'n to Pl.'s Cross-Mot. Summ. J. ("Def.'s Opp'n/Reply") at 4-6; First Mot. Hr'g Tr. at 42-43

("[W]hen you look back over the last 30 years I believe every administration except for this one which is still only a few months old has had a criminal investigation related to the White House in some way. . . .  It's reasonably anticipated that there will be an investigation that will require senior White House cooperation."); First Mot. Hr'g Tr. at 60.  DOJ also emphasizes the D.C. Circuit's explicit recognition that "Exemption 7(A) does not require a presently pending 'enforcement proceeding.'"  Def.'s Mem. at 8 (quoting *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 926).[4]

CREW responds that the "fatal flaw" in DOJ's position is that "[c]ourts have consistently interpreted the exemption to require the existence of an *ongoing* investigation or enforcement proceeding."  Pl.'s Mem./Opp'n at 8 (emphasis in original) (citing *Juarez v. Dep't of Justice*, 518 F.3d 54, 58-59 (D.C. Cir. 2008)); Pl.'s Reply Mem. Supp. Cross-Mot. Summ. J. ("Pl.'s Reply") at 3.  Therefore, according to CREW, Exemption 7(A) requires that DOJ do more than point to an abstract future investigation or enforcement proceeding that will require the cooperation of White House officials.  *See* First Mot. Hr'g Tr. at 29.  CREW also disputes DOJ's factual assertion that White House involvement in law enforcement investigations is "frequent," Pl.'s Reply at 3, and urges the Court to conclude that Exemption 7(A) does not apply because, unlike the cases relied upon by DOJ, where "the government pointed to concrete and specific enforcement proceedings that could be hampered by disclosure of the disputed records," in this case all DOJ can point to is "some vague future" investigation involving White House officials. Pl.'s Mem./Opp'n at 10 (internal quotation marks omitted).

---

[4] As CREW notes, DOJ's quotation of *Center for National Security Studies* for this proposition is highly selective. Indeed, the court qualified that statement in the very next sentence by adding, "it is sufficient that the government's ongoing September 11 terrorism investigation is likely to lead to such proceedings."  331 F.3d at 926.

When pressed at oral argument to identify cases in which Exemption 7(A) has been

applied in the absence of "investigation or enforcement proceedings actually concretely pending

or anticipated," counsel for DOJ conceded that *Mapother* is the only such case upon which the

agency relies. First Mot. Hr'g Tr. at 9, 53-55. *Mapother* did indeed recognize that Exemption

7(A) may apply where law enforcement proceedings are "reasonably anticipated" rather than

actively pending. But as the discussion below demonstrates, the position advanced by DOJ in

this case would expand Exemption 7(A) far beyond both its application by the court in *Mapother*

and Congress's stated intent.

*Mapother* arose out of a request for documents relating to an order issued by the Attorney

General barring Kurt Waldheim – the former Secretary General of the United Nations and

former President of Austria whom DOJ believed had participated in Nazi war crimes as an

officer in the German army – from entering the United States. 3 F.3d at 1535. In advance of the

Attorney General's order, the Office of Special Investigations (a unit within DOJ's Criminal

Division) had compiled a 204-page report detailing Waldheim's wartime activities. Two private

individuals subsequently filed FOIA requests seeking access to the report, source documents,

and other materials relied on in preparing the report, in addition to any summaries or indices of

the file. *Id.* at 1535-36. DOJ withheld the material citing, *inter alia*, Exemption 7(A). Upon

cross-motions for summary judgment, the district court ordered that most of the records be

released. *Id.* at 1536.

The issue on appeal was confined to whether the source materials and summaries or

indices of the report were properly withheld. *See id.* at 1537. Addressing the agency's claim

under Exemption 7(A), the court recognized that Exemption 7(A) is available only

14

where enforcement proceedings are "pending or contemplated." *Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 870 (D.C. Cir. 1980). The word "contemplated," as used in *Coastal States*, speaks to the enforcing agency's intentions. For this, we have substituted "reasonably anticipated," a phrase that may be applied equally to cases in which the agency has the initiative in bringing an enforcement action and those, such as this one, in which it must be prepared to respond to a third party's challenge.

3 F.3d at 1540. The *Mapother* court explained that "this more general standard" was necessary because although in that case there were no reasonably anticipated enforcement proceedings within DOJ's control, there *was* a "reasonable likelihood" that challenges would be brought "in the run of cases involving persons excluded from the United States" because of their alleged participation in Nazi war crimes. *Id.* at 1542. Moreover, as the court observed, the index to the report compiled in Waldheim's case would "provide the answer" to the question of what evidence DOJ had regarding Nazi war crimes, and would therefore be of great interest to other similarly situated individuals. *Id.* at 1543. For that reason, the court held that the index of the government's evidence relating to Waldheim's exclusion was properly withheld under Exemption 7(A). *Id.* at 1542-43.

In reaching this conclusion, the *Mapother* court relied specifically on *United States Department of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749 (1989), and *National Labor Relations Board v. Robbins Tire & Rubber Co.*, 437 U.S. 214 (1978), where the Supreme Court approved the use of "generic" or "categorical" determinations in deciding whether a FOIA exemption applies. *See* 489 U.S. at 776, 780 (endorsing the categorical approach in the context of Exemption 7(C), which exempts from disclosure information that would yield an unwarranted invasion of privacy, and holding that, "as a categorical matter," FBI rap sheets were exempt from disclosure to third parties); 437 U.S. at 236 (holding categorically that "witness statements in pending unfair labor practice proceedings are exempt from FOIA

disclosure [under Exemption 7(A)] at least until completion of the Board's hearing").  The court in *Mapother* thus noted the Supreme Court's observation in *Reporters Committee* that "*Robbins* and other cases 'provide support for the proposition that categorical decisions may be appropriate and individual circumstances disregarded when a case fits into a genus in which the balance characteristically tips in one direction.'"  3 F.3d at 1542 (quoting *Reporters Committee*, 489 U.S. at 776).

     Under DOJ's reading of *Mapother*, the "critical question facing this Court is not, as plaintiff contends, whether there is an 'ongoing investigation,' but whether 'in the run of cases' going forward 'there is a reasonable likelihood' that DOJ will require the voluntary cooperation of the White House."  Def.'s Opp'n/Reply at 6.  CREW counters that this interpretation of *Mapother* is overly broad, arguing that the types of potential enforcement proceedings identified by DOJ (i.e., any proceeding involving White House officials) are distinguishable from the concrete, limited proceedings described by the *Mapother* court (i.e., proceedings involving individuals excluded from the United States because of their alleged participation in Nazi war crimes).  *See* Pl.'s Mem./Opp'n at 10; Pl.'s Reply at 4.  Put differently, CREW argues that, even assuming the factual premise of DOJ's argument (that the history of past investigations involving the White House makes similar investigations reasonably likely to occur in the future), DOJ has failed as a matter of law to demonstrate that such investigations fall under the *Mapother* court's application of Exemption 7(A).  This Court agrees.

     The most problematic aspect of DOJ's position is the clear distinction between the category of proceedings recognized in *Mapother* and the category articulated by the agency in this case.  Although the proceedings in *Mapother* had not yet been commenced, the court could readily identify and articulate the scope and nature of those proceedings, in addition to the form

that they would take and the potential harm that disclosure could cause to those future proceedings.  *See* 3 F.3d at 1543 (concluding that there was a reasonable likelihood that aliens "excluded from entry into the United States because of [their] alleged participation in Nazi persecutions or genocide" would challenge the government's exclusion determination).  By contrast, DOJ has not – and cannot – describe with any reasonable degree of particularity the subject matter of the hypothetical proceedings, the parties involved, when such proceedings might occur, or how the information withheld here might be used by these hypothetical parties to interfere with these hypothetical proceedings.[5]  DOJ may be correct that the precise scope of an investigation or the statute under which a proceeding is likely to be brought need not be discerned in order to conclude that a proceeding is "reasonably anticipated" under *Mapother*'s reasoning.  Under this Court's reading of the statute and the relevant caselaw, however, the category of proceedings must be more narrowly defined than simply any investigation that might benefit from the cooperation of some senior White House official at some undetermined future point regarding some undefined subject.

DOJ's proffered reading of *Mapother* also disregards an important factual predicate underpinning the court's conclusion that the prospective-proceeding requirement had been met in that case: namely, the nexus that existed between the information withheld and the proceedings that were ongoing or anticipated.  In *Mapother*, the reasonably anticipated

---

[5]  In this sense, the category of proceedings that DOJ asks this Court to conclude are "reasonably anticipated" could encompass *any* law enforcement investigation during which law enforcement might wish to interview senior White House officials.  Such proceedings might include an investigation into alleged criminal activity that physically took place in the White House; financial wrongdoing by a White House official that took place before or during his or her tenure in the executive branch; misconduct relating to official responsibilities, such as the breach of national security protocol that formed the basis of the Plame investigation; or even an event occurring outside the White House with only tangential connection to one or more White House officials.  Thus conceived, it becomes clear that the scope of the proceedings described by DOJ is breathtakingly broad.

proceedings that the court identified were those in which accused Nazis might seek to use the withheld information to strengthen the challenge to their exclusion from the United States. *See* 3 F.3d at 1543. Here, the lack of a nexus between the information DOJ seeks to withhold in this case and the unspecified and undefined future proceedings underscores the expansiveness of the reading of Exemption 7(A) advocated by DOJ. Such an interpretation of the statute is particularly inappropriate in view of the Supreme Court's repeated acknowledgment that FOIA exemptions are to be construed narrowly. *See FBI v. Abramson*, 456 U.S. 615, 630 (1982) (reiterating "the oft-repeated caveat that FOIA exemptions are to be narrowly construed" (citing *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976))).

The Court's conclusion that the hypothetical proceedings described by DOJ do not meet the standard for withholding pursuant to Exemption 7(A) is further bolstered by the long line of cases – both prior to and since *Mapother* – that have recognized the necessity of identifying a "concrete prospective law enforcement proceeding."[6] *See, e.g.*, *Juarez*, 518 F.3d at 58-59

---

[6] The phrase "concrete law enforcement proceeding" originates in the legislative history of Exemption 7(A), during Senator Philip Hart's introduction of the 1974 amendment to that exemption. *See Robbins Tire*, 437 U.S. at 230-31. As described by the Court in *Robbins Tire*, the purpose of the amendment was to reverse court decisions that had "gone beyond" the original congressional intent of the exemption, which "'was to prevent harm to the Government's case in court by not allowing an opposing litigant earlier or greater access to investigatory files than he would otherwise have.'" *Id.* at 227 (quoting 1975 Source Book 332). As the *Robbins Tire* Court explained:

> The tenor of this description of the statutory language clearly suggests that the release of information in investigatory files prior to the completion of an actual, contemplated enforcement proceeding was precisely the kind of interference that Congress continued to want to protect against. Indeed, Senator Hart stated specifically that Exemption 7(A) would apply "whenever the Government's case in court – a concrete prospective law enforcement proceeding – would be harmed by the premature release of evidence or information . . . ."

*Id.* at 231 (quoting 1975 Source Book 333). This history underscores the narrow scope of proceedings that Congress intended to be covered under Exemption 7(A).

In an attempt to discount the above-quoted language of Senator Hart, DOJ relies on the fact that Exemption 7(A) was again amended in 1986. *See* Def.'s Resp. to Pl.'s Supplemental Mem. at 6 n.6. This argument, however, is unpersuasive when viewed in light of the numerous cases in this Circuit that have cited Senator Hart's language approvingly since the 1986 amendment went into effect. Indeed, although the 1986 amendment undoubtedly relaxed the standard required to show a likelihood of interference with an enforcement proceeding, DOJ cites no case

(applying exemption where records contained information related to ongoing drug investigation); *Boyd v. Criminal Div. of the U.S. Dep't of Justice*, 475 F.3d 381, 386 (D.C. Cir. 2007) (applying exemption where records contained information about targets of ongoing investigations); *Bevis v. Dep't of State*, 801 F.2d 1386, 1389 (D.C. Cir. 1986) (applying exemption where records related to potential prosecutions of murders of Americans that took place in El Salvador and the investigation of additional suspects remained active); *Carson v. U.S. Dep't of Justice*, 631 F.2d 1008, 1018 (D.C. Cir. 1980) (concluding that the agency's declaration was too conclusory and lacking in specificity to determine whether the withheld records in fact related to an investigation or proceeding that was ongoing).  Such a requirement is consistent with the principal purpose of the exemption, which is "to prevent disclosures which might prematurely reveal the government's cases in court, its evidence and strategies, or the nature, scope, direction, and focus of its investigations, and thereby enable suspects to establish defenses or fraudulent alibis or to destroy or alter evidence."  *Maydak v. U.S. Dep't of Justice*, 218 F.3d 760, 762 (D.C. Cir. 2000) (citing *Robbins Tire*, 437 U.S. at 241-42).  Adopting the vague category of hypothetical proceedings urged by DOJ in this case would not only be inconsistent with that purpose, but would also be in direct contravention of "the basic policy" of FOIA itself. *See Rose*, 425 U.S. at 361 (emphasizing that the "limited [statutory] exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act").  Indeed, the dramatic and far-reaching extension to the current reach of Exemption 7(A) that DOJ urges this

---

supporting the proposition that the basic purpose of Exemption 7(A) has changed.  To the contrary, that purpose, as evidenced by Congress's recognition "that law enforcement agencies had legitimate needs to keep certain records confidential, lest the agencies be hindered in their investigations or placed at a disadvantage when it came time to present their case," *Robbins Tire*, 437 U.S. at 225, continues to endure.  *See, e.g., Ctr. for Nat'l Sec. Studies*, 331 F.3d at 926 (quoting *Robbins Tire* in connection with a discussion of Exemption 7(A)'s purpose).  The 1986 amendment in fact had nothing to do with Exemption 7(A)'s reference to "enforcement proceedings," the portion of the statute to which "concrete prospective enforcement proceedings" makes reference.

Court to adopt is more properly directed to Congress to consider and, in its discretion, to enact if it sees fit.  This Court, however, is bound by the law in its current state, which does not sanction such an expansive reading of the statute.

For the reasons discussed above, the Court concludes that DOJ has failed to sufficiently identify a class of concrete, prospective, or otherwise reasonably anticipated enforcement proceedings required by Exemption 7(A).  *See Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 893 (D.C. Cir. 1995) ("There are limits . . . to when categorical rules may be employed. Only when the range of circumstances included in the category characteristically supports an inference that the statutory requirements for exemption are satisfied is such a rule appropriate." (alteration and internal quotation marks omitted)).

### 2.        Likelihood of Interference

Based on the preceding discussion, the Court is not in a position to assess the reasonableness of DOJ's assertion that the disclosure of the requested records may discourage senior White House officials from engaging in voluntary interviews with law enforcement officials.[7]  In the absence of an identifiable category of enforcement proceedings, the Court simply cannot determine whether disclosure of the information "could reasonably be expected to interfere with enforcement proceedings."  5 U.S.C. § 552(b)(7)(A).  As discussed at length above, the class of proceedings identified by DOJ is too broad and hypothetical to qualify as

---

[7]  This "predictive judgment," *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 928, discussed primarily in the Breuer declaration, has a certain intuitive logic when considered in the abstract.  The Breuer declaration persuasively explains why voluntary, non-public interviews with senior White House officials constitute a "powerful investigatory tool" that permit law enforcement to gather information outside the confines of the grand jury process, and discusses a variety of detrimental consequences that could be expected to occur if the agency were prevented from or hampered in conducting such interviews.  Decl. of Lanny A. Breuer ¶ 4.  But even assuming the reasonableness of such predictions, identifying or predicting the harm of disclosure with any specificity is necessarily premised on first identifying the requisite proceedings.  Because DOJ has failed to do so, the Breuer declaration – even if credited in its entirety – is insufficient to overcome this defect inherent in DOJ's legal argument.

"enforcement proceedings" under Exemption 7(A).  Any attempt to predict the harm that

disclosure of these records could have on such proceedings is therefore inherently, incurably

speculative.  Accordingly, the Court concludes that DOJ has failed to meet its burden of

demonstrating that the records were properly withheld in their entirety under Exemption 7(A).

The Court will now proceed to consider DOJ's other exemption claims.

### B.      Exemption 5

DOJ also claims that the requested records were properly withheld under Exemption 5,

which permits an agency to withhold documents such as "inter-agency or intra-agency

memorandums or letters which would not be available by law to a party other than an agency in

litigation with the agency."  5 U.S.C. § 552(b)(5); *see Schiller v. NLRB*, 964 F.2d 1205, 1208

(D.C. Cir. 1992) ("Exemption 5 ensures that members of the public cannot obtain through FOIA

what they could not ordinarily obtain through discovery undertaken in a lawsuit against the

agency.").  Specifically, DOJ claims that the records were properly withheld in their entirety

based on the law enforcement privilege, and that portions of the documents were appropriately

withheld pursuant to the deliberative process and presidential communications privileges.[8]

Def.'s Mem. at 9-14.

CREW responds that (1) the law enforcement privilege has never been recognized in the

context of Exemption 5, and any claim of this nature is more properly addressed under

Exemption 7(A); (2) DOJ has failed to meet its burden of demonstrating that the deliberative

---

[8]   Although DOJ is careful to distinguish between each of these specific claims of privilege, all of the claimed
privileges inhere uniquely to the executive branch.  As the D.C. Circuit explained, "'executive privilege' is generally
used to refer to a wide variety of evidentiary and substantive privileges that courts accord the executive branch."  *In
re Sealed Case*, 121 F.3d 729, 735 n.2 (D.C. Cir. 1997); *see id.* at 736 ("Since the beginnings of our nation,
executive officials have claimed a variety of privileges to resist disclosure of information the confidentiality of
which they felt was crucial to fulfillment of the unique role and responsibilities of the executive branch of our
government.").

process and presidential communications privileges apply; and (3) any legitimate claims based

on the deliberative process and presidential communications privileges have been waived. *See*

Pl.'s Mem./Opp'n at 11-20. Each of these issues will be addressed in turn.

### 1.    Merits of DOJ's Privilege Claims

### i.    Law Enforcement Privilege

DOJ argues that the law enforcement privilege shields the entirety of the requested

records from disclosure, because release of the documents "could impair a class of law

enforcement investigations, namely investigations involving the conduct of White House

officials." Def.'s Mem. at 10. According to DOJ, the law enforcement privilege is uniquely

applicable in this case because "the Attorney General has determined that a significant and

specific institutional law enforcement interest would be undermined by the release of the

documents at issue." Def.'s Opp'n/Reply at 7.

CREW counters that "[n]o court has ever recognized [the law enforcement] privilege

within the context of Exemption 5, and the only court that appears to have considered it

expressly rejected the notion." Pl.'s Mem./Opp'n at 13; *see Dean v. FDIC*, 389 F. Supp. 2d 780,

792 (E.D. Ky. 2005). Indeed, CREW correctly notes that DOJ cites no case in which the law

enforcement privilege has been recognized under Exemption 5, and that no court has ever

actually applied the privilege in the Exemption 5 context. On the other hand, DOJ correctly

notes – and CREW does not dispute – that courts in this Circuit have consistently recognized a

law enforcement privilege in civil discovery, and the agency argues that from this recognition of

such a privilege in the discovery context, "it necessarily follows that Exemption 5 incorporates

the law enforcement privilege." Def.'s Opp'n/Reply at 7.

At the hearing held on July 21, 2009, the Court asked counsel for DOJ to articulate a meaningful distinction between the scope of Exemption 7(A) and the law enforcement privilege that DOJ asserts should be recognized under Exemption 5.  Counsel for DOJ repeated the agency's position – initially articulated in its motion for summary judgment – that in this case, the two are "co-extensive."  Second Mot. Hr'g Tr. at 26, 28; *see* Second Mot. Hr'g Tr. at 31 (conceding that there should not be a "meaningful difference" between the application of Exemption 7(A) and the law enforcement privilege under Exemption 5); Def.'s Mem. at 10 (citing its briefing regarding Exemption 7(A) in a one-sentence argument that the law enforcement privilege applies); Decl. of Steven G. Bradbury ¶ 12 ("The reasons supporting the applicability to these documents of Exemption Five by virtue of the law enforcement privilege are the same reasons that are set forth above . . . to support the applicability of Exemption Seven.").  In view of this concession, the Court need not reach the question of whether a law enforcement privilege should be recognized under Exemption 5.  Even if this Court were to agree with DOJ as a general matter that such a privilege should be recognized under Exemption 5,[9] for the reasons discussed at length in Section III.A above, the Court concludes that DOJ has not met its burden of demonstrating that the records are shielded from disclosure on this basis.

### ii.      Deliberative Process Privilege[10]

---

[9]  Substantially for the reasons articulated by CREW, if this Court *were* to consider whether to recognize a law enforcement privilege under Exemption 5, it would not be inclined to do so.  In particular, the fact that Exemptions 6 and 7 already protect the law enforcement interests that are traditionally of concern in the civil litigation context weighs heavily against recognizing the law enforcement privilege under Exemption 5.  *Cf. Colo. Nurses Ass'n v. Fed. Labor Relations Auth.*, 851 F.2d 1486, 1492 (D.C. Cir. 1988) (reiterating the "basic principle of statutory construction that a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum" (internal quotation marks omitted)); *Abramson*, 456 U.S. at 630 ("FOIA exemptions are to be narrowly construed[.]").

[10]  In CREW's initial opposition to DOJ's motion for summary judgment, it argued that the agency's *Vaughn* submission did not provide sufficient information for CREW or the Court to assess the claims that portions of the documents are protected under the deliberative process or presidential communications privilege, but that in any

"The purpose of the deliberative process privilege is to ensure open communication between subordinates and superiors, to prevent premature disclosure of policies before final adoption, and to avoid public confusion if grounds for policies that were not part of the final adopted agency policy happened to be exposed to the public." *Nat'l Inst. of Military Justice v. U.S. Dep't of Defense*, 404 F. Supp. 2d 325, 346 (D.D.C. 2005).  To qualify for protection under the privilege, the withheld information must be both "predecisional" and "deliberative." *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 39 (D.C. Cir. 2002).  The deliberative process privilege thus protects from disclosure "advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Id.* (internal quotation marks omitted).  Moreover, the privilege "does not shield documents that simply state or explain a decision the government has already made or protect material that is purely factual, unless the material is so inextricably intertwined with the deliberative sections of documents that its disclosure would inevitably reveal the government's deliberations." *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997) (citing *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150-54 (1975)).  CREW contends that the withheld information (1) relates to decisions that had already been made when the interview was conducted, and is therefore not predecisional; (2) contains "purely factual" information; and (3) is already available in the public domain.  *See* Pl.'s Mem./Opp'n at 15-16.

With respect to whether the withheld information is predecisional, courts have consistently held that the deliberative process privilege "protects only communications . . . that

---

event no portion of the records properly falls within those privileges.  The Barron declaration provides a more detailed, precise description of the information that DOJ has withheld as exempt from disclosure.  *See* Decl. of David J. Barron ¶ 6(a)-(g).  CREW appears to concede that the agency's submission is now adequate to permit judicial review, but apparently maintains its position that the deliberative process privilege is inapplicable here.

are actually antecedent to the adoption of an agency policy." *Jordan v. U.S. Dep't of Justice*, 591 F.2d 753, 774 (D.C. Cir. 1978); *see also Access Reports v. Dep't of Justice*, 926 F.2d 1192, 1194-95 (D.C. Cir. 1991) (noting that the predecisional requirement "focuses attention on the role of the [information] in the decisionmaking process").  Indeed, in the leading Supreme Court case on the deliberative process privilege, *Sears, Roebuck & Co.*, the Court noted that

> it is difficult to see how the quality of a decision will be affected by communications with respect to the decision occurring after the decision is finally reached; and therefore equally difficult to see how the quality of the decision will be affected by forced disclosure of such communications, as long as prior communications and the ingredients of the decisionmaking process are not disclosed.

421 U.S. at 151.

DOJ acknowledges that "an 'after-the-fact explanation of a decision' will generally not be protected by the deliberative process privilege."  Def.'s Opp'n/Reply at 9 (quoting Pl.'s Opp'n at 16).  The agency, however, contends that "what is at issue here is not an after-the-fact explanation, but a recounting of the predecisional deliberative process itself."  Def.'s Opp'n/Reply at 9.  On this score, DOJ cites to *North Dartmouth Properties, Inc. v. U.S. Department of Housing & Urban Development*, 984 F. Supp. 65 (D. Mass. 1997), a well-reasoned decision in which the court recognized that post-decisional documents can fall under the privilege where they recount or reflect predecisional deliberations.  *See id.* at 68 (holding, after *in camera* review, that a post-decisional email that "relate[d] to and essentially re-state[d] discussions" had during the agency's predecisional deliberations was properly withheld on the basis of the deliberative process privilege); *see also Elec. Privacy Info. Ctr. v. Dep't of Homeland Sec.*, No. 04-1625, 2006 U.S. Dist. LEXIS 94615, at *22-*24 (D.D.C. Dec. 22, 2006)

(relying on *North Dartmouth Properties* in concluding that an email recounting recommendations and evaluations was predecisional).

In reaching the conclusion that the post-decisional emails were protected by the deliberative process privilege, the *North Dartmouth Properties* court pointed to the Supreme Court's recognition in *Sears, Roebuck & Co.* that "the future quality of an agency's decisions could be affected if 'the ingredients of the decisionmaking process are . . . disclosed.'  Clearly, the Court's decision reflects a concern for the chilling effects that such disclosure would have on future agency deliberations."  984 F. Supp. at 68 (quoting *Sears, Roebuck & Co.*, 421 U.S. at 151).  The court in *North Dartmouth Properties* thus concluded that post-decisional emails describing and relating predecisional discussions qualified as "predecisional" in nature and were protected by the deliberative process privilege.  *Id.*

The *North Dartmouth Properties* court's reasoning applies with equal force in the present case.  Both the declarations submitted by the agency and this Court's *in camera* review of the records make clear that the information withheld by DOJ recounts the "ingredients of the decisionmaking process," and for that reason the information withheld qualifies as predecisional – despite the fact that the interview in which the information was disclosed took place after the decisions were made.[11]

CREW's contention that the privilege does not apply because the material contained in the interviews is "purely factual" is also unpersuasive.  *See* Pl.'s Mem./Opp'n at 17 (quoting *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1113 (D.C. Cir. 2004)).  This argument

---

[11]  CREW unsuccessfully attempts to distinguish *North Dartmouth Properties* on the basis that (1) the emails at issue in that case were written shortly after the decision was made, and (2) the court acknowledged that the author of the email may not have even known of the agency's decision at the time he wrote the email.  *See* Pl.'s Reply at 8-9.  But the court's reasoning in that case was not dependent on either of these facts, and CREW fails to explain why the principles articulated in that decision are inapplicable here.

is based on the observation that the information at issue was "developed during a fact-finding process," i.e., Fitzgerald's investigation, and therefore "it is obvious that the vast bulk, if not the entirety, of the withheld material is 'purely factual.'" Pl.'s Mem./Opp'n at 17.  But as noted above, the withheld records contain statements directly relating communications that took place as part of the deliberative process.  DOJ correctly notes that the Bradbury and Barron declarations describe information that "is not only intertwined with the decision making process, it is the deliberative process."  Def.'s Opp'n/Reply at 11.  Accordingly, the withheld information is both predecisional and deliberative.

In its supplemental memorandum, CREW asserts that – based on the additional detail provided by DOJ's supplemental declarations – it has identified substantial information in the withheld records that has already been publicly disclosed.  *See* Pl.'s Supplemental Mem. Supp. Cross-Mot. Summ. J. ("Pl.'s Supplemental Mem.") at 14 n.11.  CREW additionally includes a declaration from one of its research associates describing and attaching publicly available information that CREW claims is related to the information described in the Barron declaration. In response, DOJ cites *In re Sealed Case*, 121 F.3d at 740-41, for the proposition that the deliberative process privilege is not based on subject matter, so that even if there is an overlap between the withheld information and publicly available information, the withheld information "remains privileged."  Def.'s Resp. to Pl.'s Supplemental Mem. at 8.  This Court agrees.

First, a review of CREW's declaration and attachments in conjunction with DOJ's *in camera* submission demonstrates that none of the withheld records has been publicly released; nor has information identical to the information contained in those documents been made public. More fundamentally, however, CREW's argument ignores the purpose of the deliberative process privilege, which is designed to protect the decisionmaking process itself.  Regardless of

whether certain factual information is publicly available, the information in the withheld

documents is protected precisely because it might compromise what information was considered

and what role it played in the deliberative process.  *See In re Sealed Case*, 121 F.3d at 741

("[R]elease of a document only waives [executive] privileges for the document or information

specifically released, and not for related materials.  This limited approach to waiver in the

executive privilege context is designed to ensure that agencies do not forego voluntarily

disclosing some privileged material out of the fear that by doing so they are exposing other,

more sensitive [information]." (internal citations omitted)).  For these reasons, the Court

concludes that DOJ has demonstrated that the portions of the records identified in the Barron

declaration are protected by the deliberative process privilege.

### iii.    Presidential Communications Privilege

DOJ's final Exemption 5 claim is based on the presidential communications privilege.

The Supreme Court recognized this privilege in *United States v. Nixon*, 418 U.S. 683, 708

(1974), and the D.C. Circuit has identified the privilege as one that falls under Exemption 5.  *See*

*Judicial Watch*, 365 F.3d at 1113.  The purpose of the presidential communications privilege is

to "guarantee the candor of presidential advisers and to provide '[a] President and those who

assist him . . . [with] free[dom] to explore alternatives in the process of shaping policies and

making decisions and to do so in a way many would be unwilling to express except privately.'"

*In re Sealed Case*, 121 F.3d at 743 (quoting *Nixon*, 418 U.S. at 708).

Most of CREW's initial challenge to DOJ's assertion of the presidential communications

privilege related to the dearth of specificity and justification provided in the Bradbury

declaration.  *See* Pl.'s Mem./Opp'n at 18-20.  The Barron declaration, however, substantially

narrows the scope of DOJ's original claim, noting that "OLC is only attesting that material that involves direct communications with the President is protected by the privilege." Decl. of David J. Barron ¶ 8 n.2; *see id.* (stating that the privilege in fact protects additional categories of communications, but that because of the time constraints of the supplemental briefing schedule any remaining claims would no longer be advanced). This material constitutes approximately two sentences of the withheld records, and according to the Barron declaration, the information is comprised of "direct confidential communications between the Vice President and the President [that] fall within the core of the privilege." Decl. of David J. Barron ¶ 8. Based on the briefing by the parties, it is unclear to the Court whether CREW actually contests the withholding of this information. Assuming, however, that such withholding is in fact contested, the Court nevertheless concludes that this narrow class of information falls under the presidential communications privilege.[12]

### 2. Waiver

CREW urges the Court to conclude that any legitimate deliberative process and presidential communications privileges were waived when Vice President Cheney "voluntarily revealed" the information at issue to the Special Counsel, a "third part[y] outside the White House." Pl.'s Mem./Opp'n at 12 (quoting *In re Sealed Case*, 121 F.3d at 742); *see also* Second Mot. Hr'g Tr. at 52 (asserting that "this was an adverse – potentially adversarial situation, so disclosure clearly would constitute a waiver to that third party because the FBI in that circumstance should properly be seen as a third party"). DOJ responds that CREW's position is

---

[12] The declaration provided by CREW and discussed in Section III.B.1.ii above also references information regarding presidential communications that is publicly available. For the same reasons discussed in that section, CREW's declaration and attachments fail to demonstrate that a waiver of the presidential communications privilege has been effected as to the withheld information.

"baseless," arguing that executive privileges are not waived where information is shared between government agencies, and that no such waiver occurs in the absence of a disclosure to the public or a private party.  Def.'s Opp'n/Reply at 8 (describing the interview between Vice President Cheney and Fitzgerald as the "voluntary, non-public sharing of information between an official exercising executive functions and executive branch investigators").

Both parties rely primarily on *In re Sealed Case*, 121 F.3d 729, in support of their respective positions.  In particular, CREW cites this case for the proposition that a waiver of privilege occurs unless there is a "commonality of interests" between the person divulging the information and the person receiving the information.  Second Mot. Hr'g Tr. at 52.  But the commonality-of-interest standard advocated by CREW appears nowhere in the relevant caselaw, and this Court does not read *In re Sealed Case* to require such a showing.[13]  Rather, this Court agrees with the agency that the principles articulated by the *In re Sealed Case* court lead to the conclusion that no waiver of privileges occurred here.

*In re Sealed Case* arose from a grand jury investigation of Alphonso Michael Espy, former Secretary of Agriculture, regarding allegations that Espy had improperly accepted gifts from individuals and organizations.  121 F.3d at 734.  The same allegations that formed the basis

---

[13]  In its brief, CREW also relies on an older case, which also bears the name *In re Sealed Case.  See* 676 F.2d 793 (D.C. Cir. 1982).  That case, although it discussed the effect of disclosure to third parties on a party's subsequent claim of privilege, related only to the attorney-client privilege.  *See id.* at 809.  The attorney-client privilege, however, is designed to protect different interests than the privilege claims asserted in the instant case.  *Compare id.* at 808 (discussing the purposes of the attorney-client and work-product privileges, and recognizing that "both have the same basic purpose: to promote broad public interests in the observance of law and the administration of justice" (alterations and internal quotation marks omitted)), *with In re Sealed Case*, 121 F.3d at 737 (noting that the purpose of the deliberative process privilege is to protect the integrity of agency decisions), *and Judicial Watch*, 365 F.3d at 1115 (explaining that the purpose of the presidential communications privilege is to protect presidential decisionmaking by ensuring that the President continues to receive candid advice).  That case, therefore, is inapposite.  CREW's reliance on *In re Lindsey*, 148 F.3d 1100 (D.C. Cir. 1998), is misplaced for the same reason.  *See id.* at 1103 (noting that although executive privilege claims had been raised below, the district court's ruling on those claims had not been appealed; and proceeding to address only attorney-client privilege claims).

of the grand jury's investigation led the White House Counsel to investigate Espy, and that office's investigation eventually led to the public release of a report on Espy.  *Id.* at 735.  After the release of the report, the grand jury issued a subpoena *duces tecum* for all documents relating to the report, in response to which the White House Counsel's office produced some documents and withheld others on the basis of the deliberative process and attorney-client privileges.  *Id.*  The Office of the Independent Counsel ("OIC") moved to compel performance of the subpoena, and the motion was subsequently denied by the district court.  *Id.* at 735-36.  On appeal, the D.C. Circuit considered and rejected OIC's argument that the White House's privilege claims vis a vis the requested documents were waived by, *inter alia*, the White House's public disclosure of the report and the failure to formally invoke privilege until after OIC filed a motion to compel.  *See id.* at 740.  The *In re Sealed Case* court held that the White House "waived its claims of privilege [only] in regard to the specific documents that it voluntarily revealed to third parties outside the White House."  *Id.* at 741-42.  Specifically, the court concluded that the White House's privilege had been waived as to (1) the final report itself, which had been disseminated to the public; and (2) a document that had been sent to Espy's privately retained attorney.  *Id.* at 742.

        Contrary to CREW's suggestion, the court in *In re Sealed Case* did not create a *per se* rule that a disclosure to any third party constitutes a waiver of any and all privilege claims. Rather, the court simply concluded based on the facts in that case that the deliberative process privilege could not be asserted as to documents that had already been revealed to the public and to a private, non-government attorney.  The present case, by contrast, involves the disclosure of information gained by Vice President Cheney in his official capacity and disclosed to Fitzgerald in his official capacity as a law enforcement officer.  *In re Sealed Case*, quite simply, does not address the issue before the Court – whether the information given by Vice President Cheney to

the Special Counsel constituted a protected inter-agency communication or a public disclosure to

a third party.   Nevertheless, and notwithstanding the unique role of the Special Counsel as both

part of and independent from the executive branch, this Court agrees with DOJ that the

discussion between Fitzgerald and Vice President Cheney is more appropriately considered a

protected inter-agency disclosure.   *Cf. Rockwell Int'l Corp. v. U.S. Dep't of Justice*, 235 F.3d

598, 604-05 (D.C. Cir. 2001) (concluding that Exemption 5 protection was not waived for

documents that were created as part of agency deliberations relating to an environmental

investigation and prosecution, and which were subsequently sent from DOJ to Congress as part

of an independent congressional investigation into the agency's prosecution of the action).

Indeed, in the absence of any authority dealing with an analogous relationship, this conclusion

finds further support in the *In re Sealed Case* court's recognition that because the privileges at

issue in this case "exist[] to aid the governmental decisionmaking process, a waiver should not

be lightly inferred."  721 F.3d at 741 (internal quotation marks omitted).

The Court is also unpersuaded by CREW's reliance on the Special Counsel's statement

to the Committee that there were no "agreements, conditions and understandings between the

Office of Special Counsel or the Federal Bureau of Investigation and . . . the . . . Vice President

regarding the conduct and use of the interview."  Letter from Patrick Fitzgerald, Special

Counsel, to the Honorable Henry A. Waxman, Chairman, Comm. on Oversight & Gov't Reform

at 2 (July 3, 2008), attached as Ex. A to Pl.'s Cross-Mot. Summ. J; *see* Pl.'s Mem./Opp'n at 13.

DOJ has neither controverted this statement nor argued that Vice President Cheney did in fact

seek to ensure that his statements would be kept confidential.  But such an agreement – or lack

thereof – is not dispositive.  To the contrary, because Vice President Cheney's statements

qualified as an inter-agency disclosure, his failure to formally invoke any executive privileges

did not preclude the White House's future reliance on those privileges.  *See In re Sealed Case*,

121 F.3d at 741 (concluding that because OIC's motion was "the first event which could have

forced disclosure of the documents," the White House did not "have an obligation to formally

invoke its privileges in advance of the motion").  Therefore, the Court concludes that the

deliberative process and presidential communications privileges have not been waived, and that

Exemption 5 shields from disclosure all portions of the requested records to which the privileges

apply.

      **C.**      **Exemptions 6 and 7(C)**

      DOJ has identified portions of the requested records that it claims were properly withheld

because they contain personal information that is exempt under Exemptions 6 and 7(C).  Def.'s

Mem. at 14-17; s*ee* 5 U.S.C. § 552(b)(6) (exempting from disclosure "personnel and medical

files and similar files the disclosure of which would constitute a clearly unwarranted invasion of

personal privacy"); *id.* § 552(b)(7)(C) (exempting from disclosure "records or information

compiled for law enforcement purposes . . . that . . . could reasonably be expected to constitute

an unwarranted invasion of personal privacy").  In particular, DOJ contends that the records

contain the "names of third party non-government employees, law enforcement personnel, and

low level government employees not under investigation as well as personal information such as

social security numbers" that are shielded from disclosure.  Def.'s Mem. at 14.  In its

supplemental memorandum, CREW notes that – in view of the additional declarations from DOJ

– it "does not seek the disclosure of" Vice President Cheney's Social Security number, the

names of the FBI agents who participated in the interview, or the names of CIA briefers referred

to during the interview.  Pl.'s Supplemental Mem. at 15 n.11.  Because this does not cover the

entirety of the information withheld under Exemptions 6 and 7(C),[14] however, the Court will proceed to address the applicability of these exemptions.

Both Exemptions 6 and 7(C) require the Court to balance privacy interests against the public's interest in release of the requested information, keeping in mind that disclosure of personal information does not necessarily contribute to FOIA's central purpose of fostering an understanding of the government's activities and conduct. *See, e.g.*, *U.S. Dep't of Defense v. Fed. Labor Relations Auth.*, 510 U.S. 487, 495-96 (1994); *Reporters Committee*, 489 U.S. at 773-74; *Davis v. Dep't of Justice*, 968 F.2d 1276, 1281-82 (D.C. Cir. 1992); *Reed v. NLRB*, 927 F.2d 1249, 1251 (D.C. Cir. 1991). Here, DOJ argues that CREW has failed to show any public interest in disclosure of personal information of third parties, much less a public interest that would outweigh the presumptive privacy interest that attaches to personal information under Exemptions 6 and 7(C). CREW acknowledges that personal information is presumptively withholdable under these exemptions, but disputes the agency's "conclusory assertion" that there is no legitimate public interest in the information. Pl.'s Mem./Opp'n at 20. Specifically, CREW points out that the information at issue relates to an investigation that dealt with illegal activity within the White House and that ultimately resulted in the conviction of Vice President Cheney's former chief of staff. Pl.'s Mem./Opp'n at 21. CREW thus argues that the public interest in disclosure is stronger than in most other cases, and that DOJ's failure to explain why there is no public interest in the information is insufficient "in the face of undisputed illegal activity that gave rise to the underlying FBI interview." Pl.'s Mem./Opp'n at 21.

---

[14] In particular, CREW did not disclaim any interest in what the Barron declaration describes as the "[n]ames of non-government third-parties and details of their extraneous interactions with the Vice President." Decl. of David J. Barron ¶ 11.b.

In contrast to most of the FOIA framework, the government's burden of justifying

nondisclosure is much lower where personal identifying information is concerned.  *See, e.g.*,

*Schrecker v. U.S. Dep't of Justice*, 349 F.3d 657, 661 (D.C. Cir. 2003) (noting that the D.C.

Circuit has "adopted a categorical rule permitting an agency to withhold information identifying

private citizens mentioned in law enforcement records, unless disclosure is 'necessary in order to

confirm or refute compelling evidence that the agency is engaged in illegal activity'" (quoting

*Safecard Servs. Inc. v. SEC*, 926 F.2d 1197, 1206 (D.C. Cir. 1991)).  CREW's argument that the

alleged illegal activity giving rise to the FBI interview weighs in favor of disclosure is

unpersuasive primarily for the reason advanced by DOJ – law enforcement records will almost

by definition be generated as a result of illegal or possibly illegal activity.  Indeed, protecting

individuals against the stigma of being mentioned in the context of a law enforcement

investigation is the precise purpose of Exemption 7(C).  CREW points to no evidence that

disclosure of the personal information contained in the records would shed light on illegal

activity by DOJ or White House officials, and has thus failed to demonstrate that the

"incremental public interest in such information" is sufficient to outweigh the privacy interests at

stake.  *See Safecard Servs. Inc.*, 926 F.2d at 1206.  Accordingly, this Court concludes that

Exemptions 6 and 7(C) have been properly invoked.

**D.    Exemptions 1 and 3**

Finally, DOJ claims that portions of the requested records are exempt pursuant to

Exemption 1 because of the classified nature of the material and, relatedly, pursuant to

Exemption 3 because the National Security Act specifically exempts portions of the records that

contain intelligence sources and methods.  Def.'s Mem. at 17-20; *see* 5 U.S.C. § 552(b)(1)

(exempting material that is both "specifically authorized under criteria established by an

Executive order to be kept secret in the interest of national defense or foreign policy" and that is "in fact properly classified pursuant to such Executive order"); *id.* § 552(b)(3) (exempting material that is "specifically exempted from disclosure by statute").[15]   Pursuant to this Court's Order requiring the agency to submit supplemental declarations to support its various exemption claims, DOJ submitted the DiMaio declaration to address the classified portions of the documents and justify the agency's withholding under Exemptions 1 and 3.

In view of this supplemental declaration, CREW now disclaims any interest in the disclosure of classified information "to the extent it does not include Valerie Plame Wilson's identity as a covert CIA agent and does not include information already made public through the Libby trial, Wilson lawsuit, or other disclosures."  Pl.'s Supplemental Mem. at 15 n.11.  The Court, however, is in no position to evaluate whether any of the withheld information has been publicly disclosed.  Rather, this Court's role is to consider – with the deference due to the executive branch on matters involving national security – whether the DiMaio declaration is detailed and specific enough to justify withholding under the exemptions.  *See Gardels v. CIA*, 689 F.2d 1100, 1104 (D.C. Cir. 1982) (holding that information related to the CIA's covert contacts with individuals at universities across the United States was properly withheld because the agency's position was "detailed in affidavits and depositions, is specific and fleshed out as much as it can be done publicly, and is far from being merely conclusory").  A review of the DiMaio declaration, in addition to an *in camera* review of the documents, has persuaded the Court that the agency has met its burden in this case.  *See id.* at 1105 ("The test is not whether the court personally agrees in full with the CIA's evaluation of the danger – rather, the issue is

---

[15]  The Supreme Court has recognized that the National Security Act qualifies as a withholding statute under Exemption 3.  *See CIA v. Sims*, 471 U.S. 159, 167 (1985).

whether on the whole record the Agency's judgment objectively survives the test of

reasonableness, good faith, specificity, and plausibility in this field of foreign intelligence in

which the CIA is expert and given by Congress a special role.").  These portions of the requested

records were therefore properly withheld under Exemptions 1 and 3.

## IV.     Conclusion

For the reasons stated above, the Court concludes that the agency has met its burden of

demonstrating that certain limited information was appropriately withheld from disclosure to

protect the well-recognized deliberative process and presidential communications privileges

under Exemption 5, personal privacy under Exemptions 6 and 7(C), and national security

interests under Exemptions 1 and 3.  The Court cannot, however, permit the government to

withhold the records in their entirety under Exemption 7(A) on the basis that disclosure might

interfere with some unidentifiable and unspecified future law enforcement proceedings.  The

purpose of Exemption 7(A) is to protect specific ongoing or reasonably anticipated law

enforcement proceedings.  There are no such proceedings at issue here.  Neither congressional

intent nor well-established precedent supports the application of the exemption under the

circumstances in this case, and the Court declines the government's invitation to create a new,

*per se* FOIA exemption for any and all law enforcement interviews involving high level White

House officials.  Accordingly, the Court **GRANTS IN PART AND DENIES IN PART** the

parties' cross-motions for summary judgment.  An appropriate Order accompanies this

Memorandum Opinion.


**Signed:**        **Emmet G. Sullivan**
                **United States District Judge**
                **October 1, 2009**